IN THE UNITED STATES DISTRICT COURT **FILED**
FOR THE NORTHERN DISTRICT OF ALABAMA 02 FEB 20 PM 2:5⁷
NORTHEASTERN DIVISION

N D C ALABAMA

BRENDA S. MOORE,                     )
                                     )
                 Plaintiff           )
                                     )
        vs.                          )        CASE NO. CV99-HGD-2653-NE
                                     )
ITC ^ DELTACOM, INC.,                )
                                     )
                 Defendant           )        **ENTERED**

FEB 2 0 2002

## <u>MEMORANDUM OPINION</u>

The above-entitled civil action is before the court on the motion for summary judgment filed by defendant, ITC ^ DeltaCom, Inc. (ITC ^ DeltaCom or DeltaCom).  Pursuant to Rule 73, Fed.R.Civ.P., the parties have consented to the jurisdiction of the undersigned magistrate judge.

In her complaint, plaintiff, Brenda S. Moore (Moore) alleges that defendant, her former employer, violated the Equal Pay Act, 29 U.S.C. § 206(d) (Count I); unlawfully retaliated against her for her complaints about the alleged Equal Pay Act violation (Count II); discriminated against her on the basis of her sex in violation of Title VII (Count III); retaliated against her for her complaints about the alleged Title VII violation (Count IV);and discriminated against her on the basis of her age in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621, *et seq.* (Count V).  [Doc. #15, Second Amended Complaint].

ITC^DeltaCom is a regional telecommunications company headquartered in part in Huntsville, Alabama. It is in the business of providing voice and data transmission services, including telephone, internet and e-mail services. Brenda Moore is a female who was employed by ITC^DeltaCom at its Arab, Alabama, facility from January 1996 until she resigned in April 1999. [Moore Depo. at 26-27, 142]. Prior to her stint with defendant, she worked for BellSouth for approximately 33 years prior to her retirement in 1991. While employed at BellSouth, Moore worked as a mail room clerk, cost accounting clerk, service representative, teller, computer room clerk, Grade 3 clerk, switchman, in the switching control center, and as a manager/supervisor. [*Id.* at 12-16, 19, 20].

Brenda Moore graduated from high school in 1959 and went directly to work for BellSouth. Her first job was in the mail room where she worked for approximately six months. Thereafter, she was assigned to cost accounting where she tracked the expenses for gas and oil for the company motor vehicles. She performed this job for a period of approximately five years. She then transferred to Decatur, Alabama, as a service representative where she remained until 1967, a period of approximately five years. In this job, she took orders from customers, answered complaints and collected bills. She also wrote service orders for technicians. [*Id.* at 13-15]. In 1967, Moore transferred to Cullman as a teller for BellSouth. As a teller, her sole function was to take payments from customers. She performed this job for three years. In 1970, she went on maternity leave for two years. [*Id.* at 15-16].

In 1972, Moore returned to work at BellSouth in the computer room in Birmingham. In this job, she loaded tapes on the computers, distributed printouts, and worked with

2

programmers.  She performed this job for two years.  [*Id.* at 17].  Thereafter, she transferred to Decatur as a Grade 3 clerk, where she performed clerical duties such as filing, typing, and updating records.  [*Id.*].

In 1977, Moore received a promotion to the position of switchman.  Moore was trained at switchman school.  In this job, she worked in the central office on analog equipment and switches (as opposed to more modern, digital equipment now used), wiring in telephone circuits, testing, troubleshooting, clearing trouble tickets, and working service orders.  She performed this job until 1980.  At that time, she had another child and took maternity leave for approximately six months.  [*Id.* at 17-18].

After her maternity leave, Moore went back to work in the switchman position for about three months.  She then went to work in the Decatur switching control center.  Her duties included handling trunking problems.  This was an automated process.  According to Moore, BellSouth had a program that tested all of its trunks for all of the central offices each night.  Her job was to take the printout from this program, issue trouble tickets, and work with the switchmen in the office to clear any problem.  She performed this function until 1987, when she was promoted to a supervisory position.  [*Id.* at 19-20].

In her role as a supervisor for BellSouth, Moore supervised five switchmen and four clerks.  According to Moore, her duties included ensuring her employees had eight hours of work each day, stayed on schedule, and did not allow trouble tickets to accumulate.  She also watched for alarms so that, in the event one occurred, someone could be dispatched to take care of it.  [*Id.* at 21].  She also handled performance evaluations and EEO activity.  [*Id.* at 22].

3

Moore attended four different classes in Chicago between 1988 and 1991, related to what was known as the No. 5 ESS switching machine, a digital switch. She also had training in CCS7 signaling.[1]  [*Id.* at 9-11]. She also received ongoing training regarding changes and updates. [*Id.* at 12]. While working at BellSouth, Moore also became familiar with a DMS switch, subsequently also utilized by DeltaCom, working with FRAME wires, and wiring telephone circuits, including commercial business lines. [*Id.* at 23-24]. She also received training in E-911. [*Id.* at 26]. This job entailed getting cities on-line with enhanced 911 service. In this job, she supervised the switching equipment technicians. [*Id.* at 27].

Moore retired from BellSouth in 1991 and did not work in the telecommunications industry for five years. During that time, she did nothing to stay up to date on technology in the telecommunications industry. [*Id.*]. In 1996, she was hired by ITC^DeltaCom. [*Id.*]. She initially was hired by DeltaCom as a Level I technician at a pay rate of $7.00 per hour. As such, she handled complaints from customers whose service was not working properly. [*Id.* at 33-34].

In mid-1996, Moore was promoted to Assistant Network Provisioning Administrator. At the time of this promotion, her rate of pay was $7.28 per hour, and she was eligible for a $1.00 per hour increase after she had been in the position for six months. Moore reported directly to Larry Gray. [Withey Depo. I at 137]. According to Moore, she was being paid $9.00 per hour by the end of 1996. [Moore Depo. at 48].

---

[1] This is a more sophisticated trunking system that is required for such things as caller ID and three-way calling to work. [Moore Depo. at 37].

4

Provisioning is the overall term for bringing service from point A to point B, from the customer's premises to the point of destination.  Provisioning involves the coordination, planning, implementation, and scheduling related to the circuitry that carries data between locations. [*Id.* at 80]. The provisioning process encompasses such things as ordering trunks[2] and equipment associated with them, receiving trunk orders, generating orders to other telephone carriers involved in the circuit design, and performing circuit design, planning and routing. Provisioning also encompasses the placement and maintenance of DeltaCom's own infrastructure and network to support the circuitry ordered.  [Withey Depo. I at 39, 61-62; Valentine Depo. at 102-05].  At ITC^DeltaCom, there are several provisioning departments doing different types of trunking.  [Valentine Depo. at 107].

When Moore was promoted to Assistant Network Provisioning Administrator, she worked in the same general area of provisioning as Nikki Mosely, Regina Johnson, and Tom Brown. While each ordered telephone services, they ordered different types of trunks.  [Moore Depo. at 49-50].  Moore names Brown as a comparator with regard to her claims.

## Equal Pay Act Claims

### Tom Brown

Brown was hired by ITC^DeltaCom in 1995 at a salary of $24,500 per year, with an increase to $27,000 after six months.  At the time of Moore's promotion, Brown was being paid

---

[2] A trunk is a communications pathway that carries voice or data from one point to another.  When an order for service is placed, ITC^DeltaCom completes the telecommunications path required by determining which trunks are necessary and available.  [Dodd Affidavit].

$28,000 per year.  Prior to working for ITC ^ DeltaCom, Brown had military experience as a radio systems operator and work experience as a telecommunications planner for communications cables, including routing circuits.  [Brown Affidavit].  His technical background included work on Redstone Arsenal in cable pair assignment, cable make up, and designing local circuits.  [Withey Depo. I at 75].  This experience provided Brown with an understanding of telecommunications terminology and the routing/installation of services.  [Brown Affidavit].

In a nutshell, plaintiff claims that when she was promoted in mid-1996, she took over the job functions of Tom Brown but received less pay than he did when he performed those functions.  [Moore Depo. at 63].

In order to make out a *prima facie* case under the Equal Pay Act, the plaintiff must show "that an employer pays different wages to employees of the opposite sex 'for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions.'" *Corning Glass Works v. Brennan*, 417 U.S. 188, 195, 94 S.Ct. 2223, 2228, 41 L.Ed.2d 1 (1974) (quoting 29 U.S.C. § 206(d)(1)).  The jobs held by employees of opposite sexes need not be identical; rather, they must only be "substantially equal." *Id.* at 203-04 n. 24, 94 S.Ct. at 2232 n. 24; *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1049 (5th Cir.), *cert. denied*, 414 U.S. 822, 94 S.Ct. 121, 38 L.Ed.2d 55 (1973).  It is important to bear in mind that the *prima facie* case is made out by comparing the jobs held by the female and male employees and showing that these jobs are substantially equal, not by

6

comparing the skills and qualifications of the individual employees holding those jobs.[3]  *Hein v. Oregon College of Education*, 718 F.2d 910, 914 (9th Cir. 1983); *Peltier v. City of Fargo*, 533 F.2d 374, 377 (8th Cir. 1976); *EEOC v. McCarthy*, 578 F.Supp. 45, 47 n. 1 (D.Mass. 1983); 29 C.F.R. § 800.125.  The plaintiff carries the burden of proof on this issue.

Relying mainly on the deposition testimony of DeWayne Withey, the director of network operations for ITC ^ DeltaCom and its 30(b)(6) representative, defendant claims that the job functions performed by plaintiff were different than those performed by Brown, justifying their pay differential.  Relying primarily on the Declaration of Tom Brown filed as Plaintiff's Exhibit One, plaintiff has provided evidence that the job functions performed by Brown and Moore were essentially the same and required the same level of skill, effort, and responsibility.  Therefore, there is a factual dispute regarding the similarity of job functions, and summary judgment as to this comparator is not appropriate on this basis.

Once plaintiff has established a *prima facie* case, the burden shifts to the employer to prove that the difference in pay is justified by one of the four exceptions in the Equal Pay Act: (i) a seniority system, (ii) a merit system, (iii) a system which measures earnings by quantity or quality of production, or (iv) a differential based on any factor other than sex.  29 U.S.C. § 206(d)(1); *Corning Glass Works*, 417 U.S. at 196, 94 S.Ct. at 2229.  Defendant must show that the factor of sex provided **_no_** part of the basis for the wage differential.  29 C.F.R. § 800.142.  This is a question of fact subject to the "clearly erroneous" standard of review.  *Hein*, 718 F.2d

---

[3] A comparison of the individual employees, as opposed to jobs, is relevant only to defendant's rebuttal burden as discussed below.

at 913. If such a reason is established, a plaintiff then has the burden of establishing that it is a pretext for discrimination. *Farley v. Nationwide Mutual Insurance Co.*, 197 F.3d 1322, 1336 (11th Cir. 1999).

ITC^DeltaCom takes the position that Brown's prior technical experience as a telecommunications planner and technical background in cable pair assignment, cable make up and designing local circuits justifies the pay differential. It is true that a differential based on education or experience is a factor other than sex recognized by the Equal Pay Act. *Glenn v. General Motors Corp.*, 841 F.2d 1567, 1571 (11th Cir. 1988). However, Moore also has extensive experience in the telecommunications field. When she retired from BellSouth, Moore was Supervisor of Trunking for North Alabama. Based on the descriptions of the parties regarding trunking and provisioning, it is clear that they are closely related and that knowledge of trunking is a major aspect of provisioning. Plaintiff also had experience in E-911, CCS7 conversion and digital switching. Thus, defendant has failed to demonstrate conclusively that the pay differential existed for a reason other than sex. Likewise, given the apparent similarities with regard to their respective ranges of experience and abilities, and the large disparity in pay between Brown and Moore, there is a factual dispute with regard to whether this asserted reason for the difference is pretextual. *Walker v. Nationsbank of Florida*, 53 F.3d 1548, 1564 (11th Cir. 1995) (Johnson, J., specially concurring) (a plaintiff may demonstrate pretext by showing (1) that the proffered reason had no basis in fact, (2) that the proffered reasons did not actually motivate the employment decision, or (3) that they were insufficient to motivate the employment decision).

8

Defendant further asserts that, even assuming that Moore has established a *prima facie* case, her claim of unequal pay is barred by the statute of limitations which, in the absence of a "willful" violation, is two years. 29 U.S.C. § 255(a). The statute of limitations for a cause of action that arises out of a willful violation is three years. *Id.* Moore was promoted to the position of Manager of Carrier and Facility Coordination in February 1997. Her salary was increased to $27,000 per year, plus a ten percent bonus. At this point, her salary exceeded that of Tom Brown. Therefore, unless this alleged violation is willful, Moore must have instituted her claim by February 1999 to come within the statute of limitations. Moore did not file her complaint until October 4, 1999.

A violation of the FLSA cannot be considered willful unless the employer acted not only unreasonably, but recklessly. *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 135 n. 13, 108 S.Ct. 1677, 1682 n. 13, 100 L.Ed.2d 115 (1988) ("If an employer acts unreasonably, but not recklessly, in determining its legal obligation . . . its action . . . should not be . . . considered [willful] under . . . the . . . standard we approve today."). For instance, the Court in *McLaughlin* stated that there can be no finding of willfulness when a violation is based upon a good-faith but incorrect assumption that a pay plan complies with the FLSA in all respects. *Id.* at 135, 108 S.Ct. at 1682.

Defendant asserts that there is no evidence of a willful violation. Citing cases where employers were found to have acted willfully because they had direct knowledge that they were violating the FLSA, it contends that, even assuming that these jobs are substantially equal, there is no evidence of such knowledge attributable to the defendant. Consequently, according to

9

defendant, Moore's contentions, at most, reflect a negligent pay disparity with respect to Brown. Thus, it asserts that the two-year statute of limitations bars Moore's EPA claim with respect to Brown.

The Supreme Court went to great lengths in *McLaughlin* to provide guidance for determining whether a violation of the FLSA is willful. The Court noted that the standard–that the employer either knew or showed reckless disregard as to whether its conduct was prohibited by the FLSA–must be satisfied in order for the three-year statute of limitations to apply. The Court held that this standard represents a fair reading of the Act's plain language, since it comports with the general understanding that the word "willful" refers to conduct that is "voluntary," "deliberate," or "intentional," and not merely negligent. In contrast, the statute's plain language does not support the *Jiffy June* standard,[4] set out in *Coleman v. Jiffy June Farms, Inc.*, 458 F.2d 1139 (5th Cir. 1971), *cert. denied*, 409 U.S. 948, 93 S.Ct. 292, 34 L.Ed.2d 219 (1972), which effectively limits the normal two-year statute of limitations to employers who are unaware of the FLSA and its potential applicability, a reading which virtually obliterates the distinction between willful and non-willful violations which Congress obviously intended to draw. *McLaughlin*, 486 U.S. at 132-34, 108 S.Ct. at 1681-82.

Plaintiff argues that ITC^DeltaCom acted willfully because (1) Moore performed substantially equal duties when compared with her male counterparts, but was compensated at a lower salary; (2) Withey, who was responsible for setting salaries, knew this; and (3) Withey

---

[4] The *Jiffy June* standard held that an employer's actions would be considered "willful" if it was aware that the FSLA was "in the picture" but failed to comply with it. This would cover virtually all situations because there are very few employers today who can state honestly that they are unaware of the FLSA.

10

knew it was illegal to pay Moore less than male employees in similar jobs.  The problem with this argument is that it was also addressed in *McLaughlin* and rejected.

In *McLaughlin*, the Government advocated that the Supreme Court announce a two-step standard that would deem an FLSA violation willful "if the employer, recognizing it might be covered by the FLSA, acted without a reasonable basis for believing that it was complying with the statute."  The Court noted that this proposal differs from *Jiffy June* because it would apparently make the issue in most cases turn on whether the employer sought legal advice concerning its pay practices.  It would, however, permit a finding of willfulness to be based on nothing more than negligence or, perhaps, on a completely good-faith but incorrect assumption that a pay plan complied with the FLSA in all respects.  It held that this proposal, like the discredited *Jiffy June* standard, fails to give effect to the plain language of the statute of limitations. *Id.* at 134-35, 108 S.Ct. at 1682.  Thus, to be willful, the defendant must have acted unreasonably *and* recklessly.[5]

---

[5] The Supreme Court stated:

> In common usage, the word "willful" is considered synonymous with such words as "voluntary," "deliberate," and "intentional." *See Roget's International Thesaurus* § 622.7, p. 479; § 653.9, p. 501 (4th ed. 1977).  The word "willful" is widely used in the law, and, although it has not by any means been given a perfectly consistent interpretation, it is generally understood to refer to conduct that is not merely negligent.  The standard of willfulness that was adopted in *Thurston* – that the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute – is surely a fair reading of the plain language of the Act.

*McLaughlin*, 486 U.S. at 133, 108 S.Ct. at 1681.

There has been no evidence presented that DeltaCom's assertion, that it believed it was justified in paying Brown more based on his training and experience, was made recklessly or in bad faith. While there is evidence that defendant's actions were unreasonable, there is no evidence that they were done with a reckless disregard for the EPA. The three-year statute of limitations is thus not applicable. Therefore, the court finds that plaintiff's cause of action under the EPA as to this comparator is barred by the two-year statute of limitations.

**Larry Gray**

Plaintiff also names her former supervisor, Larry Gray, as a comparator during the time that she was Manager of Carrier and Facility Coordination and Manager of IXC/CAP. In February 1997, Moore received a promotion to the position of Manager of Carrier and Facility Coordination. Her salary was increased from $9.00 per hour to at least $27,000 per year. The title of the position was changed to Manager of IXC/CAP sometime thereafter; however, the duties remained the same.

As manager of this area, Moore oversaw IXC provisioning and orders from sister companies, worked with network provisioning, and managed a portion of the ASR (access ordering) process with BellSouth. [Withey Depo. II at 62-63]. Her duties included managing the daily ordering of facilities from various vendors, coordinating daily installation and long distance service for major customers, and supervising four employees.

Moore's group ordered trunks used to transport telecommunications traffic between DeltaCom switches and between DeltaCom switches and local telephone companies. Trunks

12

between DeltaCom switches were ordered from carriers such as AT&T, MCI, and BTI.  The IXC/CAP group ordered and monitored the implementation of Feature Group D access trunks from incumbent telephone companies.  Moore also expedited orders if there was a danger of late installation.  Her group also placed and monitored orders for DeltaCom's special markets customers and for DeltaCom itself.  [Dodd Depo. at Exh. 2].

Moore had contact with the internal DeltaCom sales staff and planning personnel and with DeltaCom vendors such as carrier staff in operations, network design and sales.  However, she had little or no contact with customers and no responsibility for developing prices for services.  She also had no budgetary responsibilities or input into developing or adhering to any budgets.  [Id.].

While Moore was the manager of the IXC/CAP area, Larry Gray was Manager of Backbone Networking and Provisioning.  This area involves the transport system and infrastructure for the network comprising the several states that ITC^DeltaCom served at that time.  [Withey Depo. I at 184-86].  Gray also ordered T-1, T-3, OC-3, and OC-12 circuits from such carriers as AT&T, WorldCom, BTI, and MCI, for corporations and large retail customers.  Gray also priced T-1 and DS-3 services based on distance and other factors such as local loop connections.  He also performed network design for a number of these customers, including the State of Alabama, and dealt with the technical staff of these customers.  He used this information to design and select routes through the ITC^DeltaCom network.  [Dodd Depo. at Exh. 2].

Once these networks were up and running, Gray was responsible for "grooming" the network.  This means he monitored network traffic to avoid any one trunk from getting overcrowded, balanced it when necessary, and ordered more trunk lines when needed.  Gray also designed frame relay networks for large retail customers.  [*Id*.].

The unrebutted evidence in the record reflects that, while both Moore and Gray were responsible for a staff that wrote orders and monitored the implementation of circuits, Gray's duties required a greater level of skill, expertise and responsibility, making his position substantially different from Moore's.   For instance, Gray and his staff provided pricing information to sales personnel.  Neither Moore nor her staff performed pricing services.  Gray also had a direct role in selling high revenue network services to large customers, an important aspect of ITC ^ DeltaCom's business.

The skill required for designing networks and pricing services is greater than that required for filling out and implementing orders, and the provisioning services performed by Gray were more complex and substantially different than the provisioning services performed by Moore.  Furthermore, Moore primarily worked the day shift while Gray was constantly on call for upgrades to the network and implementation and upgrade of his customers' networks.  [*See generally* Dodd Depo. at Exh. 2].  Consequently, Moore has failed to show that she and Gray performed work requiring equal skill, effort, and responsibility deserving equal pay.  *See Waters v. Turner Wood & Smith Ins. Agency, Inc.*, 874 F.2d 797, 799-800 (11th Cir. 1989); *see also, Arrington v. Cobb County*, 139 F.3d 865, 876 (11th Cir. 1998).

**Mark Valentine**

Plaintiff also names Mark Valentine as a comparator.  Mark Valentine was hired by DeltaCom as a Project Manager in June 1998, at a yearly salary of $46,900.  He held this position for four months.  Valentine is a high school graduate with an associate's degree in business.  He also received extensive technical training while in the United States Air Force.  While in the Air Force, Valentine was trained as an electronic computer systems repairman.  [Valentine Depo. at 13-15].  For approximately one year of his Air Force career, Valentine supervised five or six other electronic computer system repairmen. [*Id.* at 18-19].

After leaving the Air Force in 1980, Valentine went to work for the Data Point Corporation in southern California.  He worked for this company for 12 years.  Initially, he was hired as a technician and was responsible for going to customers' locations to perform maintenance on computer systems manufactured by Data Point. [*Id.* at 20].  After five years as a technician, he became a district specialist.  He was responsible for the day-to-day operation of the maintenance that was conducted by approximately 14 field technicians under his supervision.  He also performed "second-level" support, assisting field technicians in diagnosing problems they could not solve on their own.  He also was required to familiarize himself with each new piece of equipment manufactured by Data Point. [*Id.* at 22-23].

Valentine remained a district specialist for five years.  At that time, Data Point was bought by another company and became known as Intalogic Trace.  After the purchase, Valentine's duties changed.  Intalogic Trace became what is known as a third-party service, meaning that it serviced all manufacturers' types of computers rather than just Data Point-manufactured

computers.  He received additional training to perform his job, including technical training on

computers, printers, and telecommunications equipment by manufacturers such as IBM, Wang,

and Hewlett Packard, in addition to Data Point equipment.  [*Id.* at 25-29].

Valentine continued to work for Intalogic for a year in California until he was the subject

of a layoff.  After a three-month layoff, Valentine moved to Detroit and was rehired by Intalogic

as a district specialist supervising 22 or 23 field technicians.  He held this job for approximately

one year.  [*Id.* at 31-32, 34].  Thereafter, he voluntarily moved to Albany, Georgia, as a "one-

man remote."  He no longer acted as a supervisor but returned to performing hands-on field

service work.  [*Id.* at 35].  After doing this for approximately a year and a half, Valentine left

Intalogic Trace.   He was hired by Motorola as a field service technician working on

telecommunications equipment such as modems and multiplexers.  As a result, he moved back

to Detroit where he performed these duties for three years.  [*Id.* at 38-39].  During this time, he

received further technical training from Motorola.  [*Id.* at 41].

After three years in Detroit, Valentine transferred to Huntsville, Alabama, and was

promoted to the position of applications engineer.  In this position, Valentine was responsible

for training the first-level technicians, as well as providing them with supervision and guidance.

He supervised between four and ten technicians.  As an applications engineer, he was also

responsible for resolving technical problems which the first- and second-level technicians had

been unable to solve.  If the difficulty was determined to be a design problem, Valentine was

responsible for working with the design engineers to resolve it.  Valentine also worked as part

16

of product development teams. He held this position for three years, leaving Motorola in June 1998. [*Id.* at 44-45, 48, 54-56, 58].

At the time he accepted employment with ITC ^ DeltaCom, Valentine also was offered a job with another Huntsville telecommunications company, AdTran. He was offered a salary equal to the pay he was receiving at Motorola. However, he accepted the DeltaCom offer because he wanted to work for a smaller company. [*Id.* at 63].

Valentine's first interview with DeltaCom was conducted by DeWayne Withey. He was questioned regarding his background from both a technical and supervisory point of view and about how his background would fit in with what DeltaCom was doing or going to do. [*Id.* at 69-71].

During a second interview a few days later, Valentine, Withey, and Mel Patterson, a DeltaCom vice president, discussed the position of trunking manager and DeltaCom's desire to become an ISP (Internet service provider) provider. During his employment at Motorola, Valentine had obtained experience in trunking in the course of helping customers to order their phone service when they were trying to adapt Motorola products to the service they were getting. He worked extensively with phone companies on the configuration of their equipment to make it work with Motorola equipment. Prior to his hiring by DeltaCom, there was no one at the company who was doing local trunking associated with an ISP. [*Id.* at 74-78]. The only discussion concerning a possible salary occurred when Valentine advised Withey that he would like to make what he was making at Motorola, and Withey inquired as to his current salary at Motorola. [*Id.* at 80, 92].

Later the same day as his second interview with DeltaCom, Valentine was interviewed a third time. The participants were DeltaCom managers Larry Gray, Jana Gibbs, and Brenda Moore. They questioned him regarding his background, technical expertise, supervisory experience, and management experience. However, there was no discussion regarding what his position would be or what his salary would be. [*Id.* at 82-84]. Shortly thereafter, Valentine was offered a management position which he accepted.

One of Valentine's initial duties at DeltaCom involved setting up an ISP effort. He had extensive experience with ISP technology. He worked with Motorola for six years with telecommunications equipment, including modems. [*Id.* at 37-39]. He had worked for Motorola as an applications engineer, with responsibility for training and supervising technicians, working with design engineers, and providing technical support for modems. Valentine was involved in the development of the 56k modem product line and was responsible for the digital data service (DDS) modems and integrated service digital network (ISDN) products. [*Id.* at 50-51, 54-55].

With regard to the ISP effort, Valentine revived the POP database[6] and set up new fields in the data base and news ways of accessing them. Another of his tasks in this regard was to research different types of systems known as "FRADs."[7] DeltaCom was considering supplying

---

[6] "POP" is an acronym for "point of presence." This is the location where a particular telephone company has its equipment. In order to access a portion of the telecommunications pathway, it is necessary to know the appropriate POP address. A POP database is a centralized source for referencing such information. [Affidavit of Annabelle Dodd].

[7] "Frame relay" is a method of connecting a data network or business to the Internet. "FRAD" is an acronym for "frame relay access device," a device that makes a customer's computer compatible with the frame relay network. [Affidavit of Annabelle Dodd].

FRADs as part of a turnkey package for its frame relay customers. He researched ten or fifteen types of FRADs using his experience building FRADs at Motorola, information gleaned from the Internet, and discussions with FRAD manufacturers including AdTran and Motorola. He also completed a draft report to establish a system of rewarding performance at DeltaCom. From June until October 1998, Valentine was a project manager, setting up the ISP division. He did not directly manage anyone during that time. [*Id.* at 127].

From October 1998 until the following April, Valentine was manager of trunking, supervising approximately six to ten employees. These employees were other individuals who were hired from Motorola, including James Madden, and two or three other existing employees who were brought over when the group was created. They all began working in group on the same day. [*Id.* at 129-130, 162]. Madden was the supervisor for local trunking. [*Id.* at 162].

Prior to the assignment of these employees to Valentine's newly-created group, these employees were assigned to sit with individuals in different groups to learn how DeltaCom operated and how to do business in provisioning. [*Id.* at 130]. Although Valentine had certain managerial responsibilities that were the same as other group managers, such as Moore, he testified that the technical aspects of the work he supervised were extremely different from that performed by the other provisioning managers. [*Id.* at 131-32]. According to Valentine, the technical aspects of his job could not be performed by just anyone, with a background in telecommunications, customer service and provisioning, learning the technical aspects of his job. He asserts that, because he was specifically skilled in ISDN and ISP types of protocols, he was uniquely qualified for his job. [*Id.* at 137].

As manager of local trunking, Valentine developed new procedures for ordering trunks that DeltaCom never had ordered before. [Dodd Depo. at Exh. 2]. These procedures were set up to support the ISP business that DeltaCom was developing. Previously, only Feature Group D trunks had been ordered for switched access and in conjunction with special access; whereas, Valentine developed procedures for ordering 911, Verifier, two-way, one-way incoming and one-way outgoing trunks. [Id.]. Orders for these trunks were sent to different departments within local telephone companies. The information required to do this was different from that needed to order Feature Group D trunks. [Id.].

In addition, long distance trunks were provisioned in the trunking group. A single order generated by this trunking group required related orders for Signaling System Seven service, translations in the central office switches, and end office detail and status reports for internal DeltaCom departments. New orders were received in the trunking group from the internal planning department and from the incumbent local telephone companies. [Id.].

Valentine also managed the day-to-day activities of staff in the trunking group. He supervised the turn-up of new trunks to other carriers when DeltaCom installed new central office switches. His group placed orders for local, long-distance, and interexchange carrier trunks associated with a switch turn-up. He also placed orders to other carriers and for routing calls to long distance carriers as a backup in case the new switch did not work as planned. [Id.].

According to DeWayne Withey, Valentine was hired primarily for the ISP effort. He confirmed that the first thing that Valentine was tasked with in this area was to research the technology of FRADs. [Withey Depo. I at 227]. Withey testified that, at the time Valentine was

hired, DeltaCom was looking for someone with the technical expertise to get it started in this area. [*Id.* at 222, 224, 227]. In the interview process, Withey and other managers (Larry Gray, Jana Gibbs, and Brenda Moore) questioned Valentine about his technical and supervisory background. [Valentine Depo. at 69-70]. Withey testified that Valentine's salary was based on his technical expertise and on the fact that the company badly needed it for the ISP effort. [Withey Depo. I at 229]. DeltaCom felt it had to have his expertise to accomplish this endeavor, and it was willing to pay for it. [*Id.* at 229-30].

As noted above, Valentine's responsibilities as manager of trunking were to get the ISP business up and running; determine what to order, how the process was going to work, who would order the trunking needed and from whom, what type of trunking was necessary to carry out the endeavor, and what type of equipment was needed; and become familiar with that technology. [*Id.* at 237]. He also had to have meetings with Bell, support the continuing endeavors of the Feature Group D carrier trunking that was already in place, and participate in engineering and technology meetings. [*Id.* at 238].

Despite the similarity in their job titles, the record makes clear that Moore's job as manager of IXC/CAP was substantially different from the job performed by Valentine as manager of trunking. Valentine's job called for higher levels of skill and responsibility. For example, IXC/CAP provisioning does not involve issuing orders specifying "translations." which specify the kinds of functions that trunks perform, how they are programmed, and the screening, routing, and class of service. This requires a higher level of skill and effort. [Dodd Depo. at Exh. 2]. Likewise, Valentine selected the FRAD system to be utilized by DeltaCom. Moore had no such

substantially equal responsibility. Valentine's responsibilities also included the start-up of the ISP group. This required a great deal of technical expertise. Moore had no substantially equal responsibilities. The court thus concludes that the jobs performed by Moore and Valentine are substantially different.[8] *See Waters, supra.*

Furthermore, there is ample evidence in the record that Valentine's pay was based on more than just what he was paid at Motorola. Withey testified that he was after the expertise possessed by Valentine and the other Motorola engineers hired by DeltaCom. According to Withey, DeltaCom desperately needed this expertise and experience and was willing to pay what the market demanded to get it. [Withey Depo. I at 266-68].

Contrary to Moore's assertion, Withey did not testify that the sole consideration for setting these employees' pay was their prior salaries paid at Motorola. Defendant correctly notes that prior salary alone cannot be used as a "factor other than sex" to explain a disparity in pay. *Irby v. Bittick*, 44 F.3d 949, 955 (11th Cir. 1995). Factors other than sex include the unique characteristics of the same job, an individual's experience, training or ability, or special exigent circumstances connected with the business. *Id.*

In *Irby,* the Eleventh Circuit addressed a similar situation stating:

> An Equal Pay Act defendant may successfully raise the affirmative defense of "any other factor other than sex" if he proves that he relied on prior salary *and* experience in setting a "new"

---

[8] The statement of James Madden that, based on his observations and knowledge, Moore and Valentine performed the same functions as manager [Plaintiff's Exh. 2, Declaration of James Madden], is of no value in this determination because he also admits that he does not know what Valentine's duties were after he became the Manager of Trunking and that, when Valentine did work with Madden, his functions were different from Moore's. [Plaintiff's Exh. 8, Affidavit of James Madden].

> employee's salary. While an employer may not overcome the
> burden of proof on the affirmative defense of relying on "any
> other factor other than sex" by resting on prior pay alone, . . .
> there is no prohibition on utilizing prior pay as part of a mixed-
> motive, such as prior pay *and* more experience.

44 F.3d at 955.

Moore also asserts that she was qualified for the position of Senior Manager and should

have been considered for the position given that she had been with DeltaCom longer than

Valentine and had worked for BellSouth for 30 years. However, Withey promoted Valentine

from his trunking manager job to Senior Manager in April 1999, effective June 1, 1999.

Valentine did not apply for the position. Withey presented him the opportunity to become a

senior manager in a new position that was being created within provisioning. [Withey Depo.

I at 139-42]. At that time, his annual salary was increased from $46,900 to $52,000. His job

was to manage and provide direction to the provisioning groups in his area of responsibility.

The employees included Juanita Barton, who replaced Valentine as manager of local trunking,

and Brenda Moore, who handled IXC/CAP provisioning. [*Id.* at 144-46, 149-50]. Subsequently,

the FRAME group managed by Michelle Ingle became part of Valentine's group for a period of

six to eight months. He also took on the facility database group, which maintains the facility

records and does all the routing of circuits, and the circuit redesign group, which is tasked with

making DeltaCom operations more efficient and cost-effective. [*Id.* at 151-53].

DeWayne Withey testified as to the reasons for the selection of Valentine for the Senior

Manager position:

23

> We had already been in the  - - well down the road with the ISP effort.  We had gone through the growth, we had gone through new technology with the new castle switches and everything.  A lot of this technology when it was launched, especially the castle switches, did not perform up to par.  We had to drop back, move a lot of facilities around, do a lot of planning, borrow, rent, lease additional facilities and everything to continue  the effort and the sales that was already sold to ISPs.  So, during that whole endeavor that first year in that role, he was very instrumental in getting the work done, meeting our scheduling and everything else.  The company decided to continue that effort.  It's now 80 percent of our local business.  So they were asking me to continue to go on to the future, so they wanted another senior manager in provisioning along with Jana Gibbs . . .
>
> . . . . .
>
> I did not consider anyone else due to the effort that the company was putting into the ISPs, the direction, the amount of revenue we had at stake.  There was clearly one choice to continue in that effort due to his performance up to that point.

[*Id.* at 257, 259].  Valentine had considerably more technical, hands-on experience than Moore.

Thus, even assuming that Moore and Valentine had performed substantially equal job duties as

group managers, defendant has demonstrated that Valentine's promotion to Senior Manager

and pay raise both were based on factors other than sex.  Plaintiff has provided no evidence of

pretext.  Therefore, Moore's Equal Pay Act claim as to this comparator is due to be dismissed.


**James Madden, Eric Chaviers, and Other Former Motorola Employees**

In June of 1998, DeltaCom hired six former employees of Motorola.  Among these

newly-hired employees was James Madden.  DeWayne Withey testified that he does not recall

having any discussions with Madden concerning his salary.  He stated that he does not recall

how they arrived at a figure for his salary, except that he was sure it was "in the realm" of what

his salary was at his previous employer. [Withey Depo. I at 244]. However, he also testified that he was paying for the technology and experience that Madden brought to the table. [*Id.* at 246-47].

Prior to working for DeltaCom, Madden worked for Motorola as a technical support specialist. His job duties initially entailed answering the telephone and providing customer support. He eventually moved up to what he identified as a third-level support specialist position, which entailed customer support at customer locations and debugging telephone wires and modems. [Declaration of James Madden].

According to Madden, when DeWayne Withey hired him, Withey asked him how much he was making at Motorola and told him that he would match that amount. Madden was initially designated as a Local Trunking Supervisor and paid a salary of $38,000 per year. After approximately two years, his salary was increased to $42,000. When Madden first began working for DeltaCom, he was supervised by Moore. [*Id.*]. At that time, Moore's salary was $33,000 per year. Madden states that when he was hired by Withey into the position of Supervisor-ISP Division, he had no previous training that prepared him for this position. According to Madden, Moore provided much of the training that prepared him for his position with DeltaCom.

DeWayne Withey testified that Madden and the other former Motorola employees hired by DeltaCom were placed under the supervision of Moore until Valentine got the ISP effort up and running. At that point, they were placed under Valentine's supervision. [Withey Depo. I at 250-51]. According to Withey, Madden's responsibilities were to help start the ISP effort by

25

managing the work and meeting the schedules.   On a daily basis, his duties included communicating with BellSouth to coordinate the work between "the trunking folks and the organization." [*Id.* at 251-52].

Madden, however, states that after Valentine replaced Moore as his supervisor, he had the same job responsibilities that he had while working under Moore's supervision. [Declaration of James Madden].   According to Madden, the only difference between his job and that performed by Moore was that Moore worked with the long distance, and he worked with the local calling side of the house.   [*Id.*].

While defendant asserts and provides some support for its argument that local trunking is more complex than long distance trunking, there is no evidence in the record to reflect that the duties actually performed by Madden were any different or more complex than those performed by Moore.   The evidence also does not reflect that the skill level and relevant experience possessed by Madden are any greater than that possessed by Moore.  Therefore, the court concludes that Moore has established a *prima facie* case of a violation of the Equal Pay Act with regard to James Madden.   Defendant has failed to present sufficient evidence that this difference was based on reasons other than sex. Thus, a factual dispute exists, making summary judgment in defendant's favor inappropriate.

The evidence reflects that Eric Chaviers was paid $33,800 a year when he was hired. This is more than plaintiff's salary of $33,000. Despite the fact that Moore supervised Chaviers and all of his work functions, he was paid more. [Moore Depo. at 119; Withey Depo. II at 98]. Therefore, the court concludes that Moore has established a *prima facie* case of a violation of

the Equal Pay Act with regard to Eric Chaviers. Defendant has failed to present sufficient evidence that this difference was based on reasons other than sex. Thus, a factual dispute exists, making summary judgment in defendant's favor inappropriate.

The evidence referenced by plaintiff reflects that former Motorola employees Lopez, Mitchell and Holt all received salaries less than Moore's. Therefore, she has not established an EPA violation with regard to these employees. Plaintiff has failed to direct the court's attention to any evidence that supports her claim of wage discrimination with regard to any of the other former Motorola employees or other male employees hired by DeltaCom. Trial courts are not required to search the record and construct every argument that could have been made based upon the proffered materials. *Restigouche, Inc. v. Town of Jupiter*, 59 F.3d 1208, 1213, n.5 (11th Cir. 1995), *citing Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995). Therefore, summary judgment is appropriate with regard to these claims.

## Title VII Claims

Plaintiff has only attempted to support Title VII claims against ITC ^ DeltaCom based on her treatment vis-a-vis Tom Brown and Mark Valentine. She filed her charge of discrimination on September 23, 1999. Only those instances of alleged discrimination occurring within 180 days of that date are actionable under Title VII. 42 U.S.C. § 2000e-5(e). The law in the Eleventh Circuit allows a plaintiff to raise an otherwise time-barred act of discrimination only if it is part of a continuing violation. *See Roberts v. Gadsden Mem. Hosp.*, 835 F.2d 793 (11th

Cir. 1988). To be a continuing violation, there must be a substantial nexus between the alleged acts of discrimination.

**Tom Brown**

The alleged acts of discrimination with regard to the pay differences between plaintiff and Tom Brown came to an end in February 1997 when she was promoted to a position as a manager. Thus, this cause of action lapsed 180 days thereafter, or in approximately August 1997. Valentine was not hired until June 1998. Therefore, there is no continuing violation alleged by Moore which will save her charge with regard to Brown from being time-barred. "The continuing violation doctrine does not exist to give a second chance to an employee who allowed a legitimate Title VII claim to lapse." *Id.* at 800.[9]

**Mark Valentine**

In evaluating Title VII claims based on circumstantial evidence, the court uses the framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and by the Eleventh Circuit in *Willis v. Conopco, Inc.*, 108 F.3d 282, 284-85 (11th Cir. 1997). Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of

---

[9] Plaintiff has presented no evidence to support Title VII claims against Gray, Madden, or anyone other than Valentine and Brown. Therefore, the alleged EPA violations with regard to these other DeltaCom employees will not serve to provide the nexus from Valentine back to Brown.

discrimination by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 253-54 & n. 6, 101 S.Ct. at 1093-94 & n. 6.  Once a *prima facie* case has been established, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the challenged employment action.  *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S.Ct. at 1094.  If a defendant carries its burden of producing legitimate, non-discriminatory reasons for its decision, the plaintiff is accorded the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence."  *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095.  The plaintiff at all times retains the ultimate burden of persuading the trier of fact that the employer discriminated against the plaintiff.  *Id.* at 253, 101 S.Ct at 1093.

> The "factual inquiry" in a Title VII case is "whether the defendant intentionally discriminated against the plaintiff." *Burdine, supra*, at 253, 101 S.Ct. at 1093.  In other words, is "the employer . . . treating 'some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978), quoting *Int'l Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n.15, 97 S.Ct. 1843, 1854, n.15, 52 L.Ed.2d 396 (1977).  The *prima facie* case method established in *McDonnell Douglas* was "never intended to be rigid, mechanized, or ritualistic.  Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco, supra*, 438 U.S. at 577, 98 S.Ct. at 2949.  Where the defendant has done everything that would be required of him if the plaintiff had properly made out a *prima facie* case, whether the plaintiff really did so is no longer relevant.  The district court

29

> has before it all the evidence it needs to decide whether "the
> defendant intentionally discriminated against the plaintiff."
> *Burdine, supra*, 450 U.S. at 253, 101 S.Ct. at 1093.

*U.S. Postal Service Bd. of Governors v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1482, 75

L.Ed.2d 403 (1983).

Based on the analysis and reasoning set forth above with regard to Moore's EPA claim

against Valentine, the court finds that plaintiff has failed to establish a *prima facie* case of wage

discrimination based on sex. Moore has failed to establish that she performed work similar to

that performed by Valentine. Furthermore, ITC ^ DeltaCom has established a legitimate, non-

discriminatory reason for the pay differential, that being Valentine's superior credentials and

more complex job functions. Plaintiff has presented no evidence that these reasons are

pretextual in nature. Therefore, plaintiff's claims pursuant to Title VII are due to be dismissed.


## Age Discrimination Claims

Plaintiff has failed to direct the court's attention to any evidence which supports her

claim that she was the subject of unlawful age discrimination. Therefore, this claim is due to

be dismissed. *See Restigouche, supra.*


## Retaliation Claims

Moore contends that she was denied a promotion and terminated from employment

in retaliation for complaints about male employees making more money than she made. In

order to establish a *prima facie* case of retaliation, Moore must establish (1) that she engaged in

30

statutorily-protected expression; (2) that she suffered an adverse job action; and, (3) that there is a causal link between the protected expression and the adverse job action. *Wolf v. Coca-Cola Co.*, 200 F.3d 1337,1342-43 (11th Cir. 2000).

Moore resigned from ITC ^ DeltaCom. She asserts that she was told that she either had to (1) withdraw her resume from consideration by another employer and accept the promotion of Valentine to Senior Manager, or (2) leave the company. She resigned later that same day. Thus, her claim is one of constructive discharge.

Constructive discharge requires proof of conduct "so intolerable that a reasonable person in [plaintiff's] position would have been compelled to resign." *Durley v. APAC, Inc.*, 236 F.3d 651, 658 (11th Cir. 2000). A single disappointment over one's job is not a reasonable basis upon which to leave employment. *Garner v. Wal-Mart Stores, Inc.*, 807 F.2d 1536, 1539 (11th Cir. 1987). Further, discrimination in the form of pay cannot, by itself, be sufficient to support a finding of constructive discharge. *Bourque v. Powell Elect. Mfg. Co.*, 617 F.2d 61, 65 (5th Cir. 1980);[10] *Henderson v. Leroy Hill Coffee Co.*, 2001 WL 103147, *10, n.18, 80 Empl.Prac.Dec. ¶40507 (S.D.Ala. Jan. 30, 2001).

Moore concedes that she was upset over Valentine's promotion to a position for which she believed she was better qualified. However, there was no discussion regarding her alleged complaints about her pay before she submitted her resignation. There is no evidence of

---

[10] In *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all Fifth Circuit decisions handed down prior to the close of business on September 30, 1981.

harassment, intimidation or derogatory comments relating to these alleged complaints. Therefore, she has failed to establish constructive discharge or a *prima facie* case of retaliation.

Even assuming plaintiff has demonstrated a *prima facie* case, ITC^DeltaCom has established a legitimate, non-discriminatory reason for the promotion of Valentine to Senior Manager, that being Valentine's knowledge of ISP operations (when considered in light of the fact that this aspect had become a very large part of DeltaCom's business), superior credentials, and more complex, hands-on technical skills. Plaintiff has presented no evidence that these reasons are pretextual in nature.

The inquiry into pretext centers upon the employer's beliefs, and not the employee's own perceptions of his performance. *Holifield v. Reno*, 115 F.3d 1555, 1565 (11th Cir. 1997). Moreover, it is well-settled that "Title VII does not require any employer to hire or promote the most qualified applicant." *Smith v. Horner*, 839 F.2d 1530, 1538 (11th Cir. 1988). As the Eleventh Circuit has explained, "an employer's decision to promote [one qualified employee rather than another] may seem to some to be bad business judgment, and to others to be good business judgment, but federal courts do not sit to second-guess the business judgment of employers." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1543 (11th Cir. 1997); *Elrod v. Sears Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991) ("Federal courts do not sit as a super-personnel department that reexamines any entity's business decisions."). Therefore, plaintiff's claims of retaliation are due to be dismissed.

32

### CONCLUSION

Based on the foregoing, the court concludes that the motion for summary judgment filed by defendant, ITC^DeltaCom, concerning the alleged Equal Pay Act violations with regard to James Madden and Eric Chaviers is due to be denied.  The motion for summary judgment as to all remaining claims is due to be granted.  A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

DONE this _20_ day of February, 2002.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

33